Good morning, everyone. Our first case this morning is Kuebler v. Vectren Corporation. Mr. Monteverde? Yes, hi, good morning. Is that my cue to get started? I wasn't sure if we're just doing appearances first or... Yeah, you may proceed. Everyone is here. Can you hear me? This is Judge Sykes. Yes, I can hear you. Can you hear me okay as well? Yes, I can hear you. I think the other judges can as well, so you may proceed. Well, thank you so much. Today, we have really a matter that's very straightforward, which is the District Court erred as a matter of law in a motion to find that the omitted projections were not material. The Supreme Court has set a very high bar on their TSC of when a court can dismiss a case at a motion to dismiss. And it's only when it's so obviously unimportant that no reasonable shareholder would disagree. And here is the opposite. For two reasons. One, we had a but also supported by... But two, more importantly, the court itself found and said that the projections might have made a difference to a reasonable shareholder. And that does not support dismissal because... That means it could be... Didn't the Supreme Court reject that argument with respect to Mike, to your might argument that the District Court found in TSC Industries? The Supreme Court specifically said there, we agree with Judge Friendly, speaking for the Court of Appeals in Gerstle, that the might formulation is too suggestive of mere possibility, however unlikely. And that was a summary judgment. Distinction there to be made, but the Supreme Court also made it clear that... But that wasn't a factual issue. That was... They were saying that based on an application of the standard in the likely standard, that might just didn't meet that standard. And I don't think we just meet might. I think what I'm saying is the court further support to the allegations in our pleading, which are supported by our expert. I mean, frankly, we're talking about an actual disclosure that was omitted of the key metric for reporting the discounted cash flow analysis. I keep the point, 1st Connecticut, CART versus 1st Connecticut. The District Court's opinion in Maryland, I think is more recent, where they denied the motion to dismiss, saying the plaintiff has done enough at a motion to dismiss to allege what needs to be alleged in order to survive a motion to dismiss. So truly, we have three issues in play here. One is, what's the materiality standard? And I think it is something we have supported. That is, no, no court could find information we submit to be material, to be not something they would want to have. And then it's a complaint, a motion to dismiss, that is supported by allegations and supported by an expert, not that should proceed to discovery. And I submitted, have submitted, should proceed to discovery. And the idea that the safe harbor could save defendants from liability also is improperly used because we're not challenging actual results. We're saying, aha, you said you would, you make a million dollars and you didn't do it, and now we want to sue you. We're saying, you didn't tell us how much money you would make. And the allegations and the complaint, I think it's in 59 through 61, is support that it looks like the bankers, Bank of America, Merrill Lynch, matter of fact, very high discount rate. We're not challenging the discount rate. We're just saying that's further support that if you hide the key metric, which here is the cash flows, and you do assumptions that are not appropriate, you're really not letting shareholders see the real picture. And so you had Wall Street saying, hey, this company is going to be doing great in the future. It has prospects for excellent growth, I think, on paragraph 61. Again, it supports the fact that we have ability to prove damages for sure at a motion to dismiss. And frankly, we're really dealing with the body of law of half-truths, and as well as from Delaware transfer court, provide a fair summary. Not disclosing the key metric of cash flows is a violation of what a fair summary is, and it's a violation of not disclosing the full truth. Mr. Monteverde? Yes. I could ask, as I understand this, we're supposed to evaluate the potential materiality of was disclosed to see whether it would have significantly altered the total mix, correct? Yes, I would agree with that. And the SEC has rules that require, for example, audited financial statements, balance sheets, cash flow, that's all part of the proxy statement, right? Yes, that is correct. Okay, and then... It's body of law as well. Right. And then, so I guess, given the relationship among these different metrics, net income, depreciation and amortization, EBITDA, and then capital expenditures that are disclosed there, and the financial information from the company that's presented historically, how would management hide value by disclosing, by failing to disclose free cash flow? I have a lot of trouble understanding. I understand why a buyer or a creditor would really want to see that number, and presumably they did, but how do you hide value? Right. So all the metrics you're pointing out are revenue-driven metrics. Cash flow is sort of your profit. So to get from EBITDA or net income, for example, to cash flow, you need more than capital expenditures. You need change in net working capital. You need taxes. There's a lot of other line items. And the truth of the matter is, and to your point, the SEC may have rules, but there's also a body of law, federal and state law, that says projections are the most important thing, and cash flow in particular. We have rulings like from Ohio, niching versus DPL. We have rulings from Delaware, Chancery Court, like Merrick Capital. I'm not asking so much about precedent, because I'm not sure that this is really governed very specifically by precedent that we are obligated to follow. But I'm trying to understand the logic of your position. Let me, if I could, test a little bit further. In the proxy statement, as I understand it, your theory is we're entitled to basically look over Merrill Lynch's shoulders and make our own evaluation of the fairness of this price. The proxy statement says on page 32 that the Merrill Lynch investment bankers reviewed certain internal financial and operating information with respect to business operations and prospects of the company. Furnished two were discussed with us, and discussed the past and current business operations, financial condition and prospects of the company with senior management. Would your theory allow you to argue in the next case, if we accept this here, that all of that information also needs to be included in the proxy statement? And if not, why not? Not at all, Your Honor. We need the key metric, and here cash flow was a key metric by its own admission that they perform a discounted cash flow analysis. And unlike Trahan, for example, who is a senior manager of Merrill Lynch, who is a senior manager of Merrill Lynch, they say we did this discounted cash flow. They also say we based our opinion on all this information that we got from management and these internal documents, which presumably are treated as pretty confidential, right? Yeah. So let me back up because your real question is why does cash flows matter? It's the only metric that tells you the profitability. That's not my question. I asked my question. The question is, why doesn't your, why doesn't your reasoning, if we were to accept it here, extend to all of this other information that the Merrill Lynch advisors relied upon? That would not be a key metric or a fair summary. A fair summary is give me what's most important information. Cash flows is the most important information because it's the analogous line item to profitability. EBITDA is not. Revenue and net income is not. Cash flow is. And that's why, again, not to cite Preston, but there is Preston supporting that. And this was a motion to dismiss with an expert. And why can't you back into free cash flow from the information that's available? You're missing some of the elements. For example, the change in working capital. You're also missing the corporate tax rate. You've got all that. You've got that kind of information from the last two years, correct? You know what capital looks like. You know what taxes look like, right? Not a hundred percent, but I see where your honor is going, that they had it projected. We don't know. We could guess. You're saying, could we guess? Maybe, but you're changing capital. It's changing working capital is not there. And that's important. I mean, that's one of the elements. You can see that in Vistapedia would tell you there are five elements. So they're missing a couple elements. And cash flows, frankly, is not a disclosure that is regularly omitted in projections. I would tell you, look, this is all I do. I review a lot of the citations that the other side relies on, that it doesn't matter because the bankers might have prepared it. That was the same issue in First Connecticut. And the court didn't think that mattered. And it shouldn't matter who prepares it. It was used, exists, and shareholders should be given that. And frankly, they also conflate the issue from Walgreens, for example, that was trying to approve a settlement that was about works, not about finance. This is about finance, and we're trying to do the right thing, which is recover damages. And we have a compelling story that it wasn't sold at a good price. It had growth. They didn't take advantage of other bids that were at a higher price from other bidders. And I think that suffices for loss causation as well. And again, ample precedent to say loss causation was met. Before you move on, let me pick up on Judge Hamilton's question. What about the business segment projections? Your argument seems to be that you're entitled to that information because Merrill Lynch, in conducting its financial review, reviewed it. Why doesn't that argument lead to the concern that Judge Hamilton posed? Wouldn't that go down the road that anything they looked at would be required to be disclosed in the proxy statement? Thank you. No, I think they would have to provide a summary, a fair summary. I'm not suggesting a broad... But I'm talking about the basis of your argument. For the cash flow projections, you said, well, no, we argued that that's a key metric. So put those aside. But your argument with respect to the business segment projections, the reason you allege and what you argue is that Merrill Lynch looked at those, therefore, we're entitled to look at those. Would that open up to anything that an outside financial advisor looked at should then be disclosed in the proxy statement if we agree with you about the business segment projections? I think you should provide a fair summary of the I don't provide every line item. I think, for example, they could have provided the cash flow as well. I understand you think that should be disclosed, but your basis for the disclosure was, well, Merrill Lynch saw it, so therefore, we should see it. So does that mean everything that Merrill Lynch saw you should see? And if not, where do we draw the line? At a fair summary. And what's that based on? Well, that's based on precedent. We cited a lot of cases. I mean, it is Delaware law, state law. I agree with it's not federal law, but I do agree that there has to be a basis where you draw a line. I do agree with that. But if you were to tell me which one would you choose, I would choose cash flows. I think there is merit to say the basic projections that were reviewed and used, not just reviewed. I agree with your honor. If let's say you're using diligence, right, to decide what to then use in your fairness opinion, you got to draw the line there. It's not all the diligence. It's what's actually used, reviewed, and presented to the board to of this merger. And I think the segment projections were significant, but I would categorize them on a second tier versus cash flows is a stronger disclosure violation. I'll just touch, unless the court has more questions on materiality, I want to touch briefly on cost causation. We have lane versus page that outlines the specific elements on it. We identify the misrepresentation. Are you disputing for section 14a causes of action that you need to allege both loss and transaction causation? I'm not disputing that, but I'm saying that sometimes, in this case, they sort of go hand in hand because they don't have much materiality. It flows that the document they used to approve the transaction would be. Well, some of the allegations may overlap, but they're very distinct concepts. Yeah. The reality is that's a little bit of an open question. We don't have a lot of, the Supreme Court hasn't really given us much beyond mills. That's a reality, but I think- Well, that's not true. You have basic versus Levinson, and you certainly have other case law out there on the distinct difference between loss and transaction causation, and you seem to be arguing here that you've alleged transaction causation, but I'm not seeing the allegations that would support a loss causation element. Well, we allege that there were higher bids because it was an uninformed vote. Those bids were not properly considered, and that if you show the actual growth of the company- What do you allege the economic loss caused by the alleged omission was? You mean the actual mathematical, the arithmetic? We don't- Not the arithmetic, but what do you allege the economic, for loss causation, you have to have economic harm caused by the alleged omission. Thank you. So, we allege that the company was worth more than it got sold for, and the fact that they don't provide the information to show it, the cash flow, is how they get the vote approved, and shareholders should have got the delta, the difference of what the company would be worth based on those cash flows, which, by the way, if you put the discount rate aside that they used, which was a 6.4 midpoint, and you use the Bloomberg rate that we put in our pleading, that's rough math, but if you take then the cash flows anywhere from the 60 to 75 range they had, probably from mid-70s to 90, this is dollars and cents, but we would then have expert testimony at trial on what the exact damages are, and I think we have alleged enough for a motion to dismiss. Reserve some time, unless the court has more questions, I'm happy to address them now. That's fine, thank you. Thank you. Mr. David. Good morning, Your Honors, and may it please the court, Danny David here to present argument for the appellees. Appellants complain that Vector did not provide two projections used by its financial advisor in just one of three valuation frameworks to support a fairness opinion, which itself was but one of 11 reasons the company's board of directors recommended the merger following a four-month auction process that resulted in a 17% premium to the shareholders and was supported by 95% of the voting shares. Against this context, appellants cannot possibly plead that the two projections were material because the proxy provided a fair summary of the valuation process, and appellants' bare desire to recheck the work of the financial advisor is insufficient as a grounds. First, for failure to plead material misstatements and second, for failure to plausibly plead a loss causation. There is also a third ground to affirm, that appellants failed to plausibly allege that the alleged omissions at issue in this case rendered any statement in the proxy false or misleading as required by Rule 14a9 in the PSLRA. I want to start with materiality, and the standard for materiality is the one set forth in TSC, and that the substantial likelihood that a reasonable shareholder would consider the omitted information deciding how to vote or the substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable shareholder as having significantly altered the total mix of information available. The so obviously unimportant language almost always travels with this formulation of the TSC materiality standard. It's not perfect, but it's the standard that companies use every day in deciding what to disclose. Fortunately, it comes together with a group of core principles that inform its application. For example, the materiality determination is never made in a vacuum. There is no per se rule requiring the disclosure of projections. Shareholders are entitled only to a fair summary of the financial advisor's work. Courts routinely recognize that Section 14a does not require disclosure of every input either considered by the financial advisor or required to recreate the financial advisor's analysis or required to make an independent determination of fair value. Here we had 10 years worth of other projections disclosed, and those projections included net income and EBITDA earnings. We know that other courts, including the Eighth Circuit, have considered net income to be more important than cash flows in the transgenomic case. Here, Appellant's counsel says that cash flow is most important. There he said that it was net income. Now, we have an eight-page summary of the fairness analysis performed by the company's the merger, not limited to the financial analysis or the fairness opinion. We have 12 pages summarizing the background of the auction process that the company ran here, and against this context, the unlevered cash flows that the financial advisor generated and evaluated would be cumulative at best. Now, we know the materiality is intended as a gating mechanism. I do have a question about whether, if we affirm, we're setting a new and higher bar at the pleading stage for the materiality standard if we issue an opinion that says cash flow projections are not material in the circumstances of this complaint. Does that raise the bar, an appellate opinion that says that in this case? Does that raise the bar at the pleading stage? Your Honor, there are plenty of courts that we cite on pages 13 and 14 of our brief that have arrived at that conclusion. However, we are not asking the Seventh Circuit to render its decision on a per se rule. In fact, we disclaim all per se rules. We say instead that this court has within its means the ability to look at what other information was disclosed, what kind of process was run, and find that the disclosure of free cash flows in this case is not material under TSC. And we believe, in fact, that many of—look, the divine some sort of per se rule, and then quote it back to you in this case and in the 43 other cases that Appellant's counsel pursued in 2018 alone. But those cases actually are not to the contrary. Many involve the disclosure of factually inaccurate financial information and stand for the unobjectionable proposition that a false disclosure can be materially misleading when, for example, the disclosures are falsely identified, that they weren't transgenomic. And other cases stand for the equally unobjectionable proposition that omitted information may change the underlying factual accuracy of what was disclosed. For example, where there are two sets of projections, but only one is disclosed, and that's the NetSmart case. Or the CEO is plausibly alleged to tip the management is conflicted and has overstepped the board, or the financial advisor is conflicted, or the board is conflicted, or a special committee was needed but not created, as in the nifting the DPL case that the Appellant's counsel cited. It told sort of the principle here is that if there's something wrong, if there's something plausibly that is wrong with the total mix of facts, then the court can apply TSC and make a determination on materiality. In this instance, however, the amended complaint doesn't allege that any of the defendant's disclosures were actually false, or the disclosure of unlevered cash flow projections would have actually called into question the accuracy of any statements in the proxy. Instead, Appellant's counsel wants to arrive there by fiat. He wants to say, we haven't seen the numbers, so we know they're going to be We're aware of no case in which unlevered cash flow or business segment projections have been found to be material under these circumstances. This was an auction. The directors did not continue with the company. Their incentives to maximize returns track that of the shareholders. The district court here made the correct decision on materiality and determined that there was nothing further that had to be disclosed, and it did not need to do any violence to TSC materiality standard to get there. Mr. Davis, apparently the way our microphones are working, it's a little tough to get in a word edgewise. Given that all of this other information was being provided, the projections of net income, of EBITDA, of capital expenditures, and so on, why not include the unlevered cash flow in the disclosures? A couple of reasons, Your Honor. First, in this case, the free cash flows weren't generated by management. They were crafted by the financial advisor as part of their analysis. Second, there is inherent risk in disclosing projections, much less projections that go out to 2027, in that you're providing information to the market that may actually not come to bear. This is why you need to be reasonably concerned about the quantum information you put out there in the market. But we're talking, you're already providing a lot of pretty detailed projections there with those other measures. What is there special about unlevered free cash flow that would lead you not to disclose that? Your Honor, the summary that is on page 40 of the proxy we believe to be fair, and there's net income and there's EBITDA information there, free cash flow information generated by a financial advisor disclosed by management is simply quite a risky proposition under the circumstances. I'm not tracking. Why? Why is it riskier than the disclosure of these other 10 years of projections? At a minimum, the net income and EBITDA information that's in the proxy was actually generated by management. That is their information that they created, and therefore they can feel comfortable to disclose or not on page 40. If the financial advisor then gets information, generates its own cash flow to put in its DCF analysis, that's the banker's information, and maybe they're proprietary, born of the banker's experience and insight, and therefore the information may be simply one of many inputs used by the banker, generated by the banker, and the company may not disclose it. Mr. David, how do you get around the allegation that the unlevered cash flow metric is the most important metric to them? Why isn't that a factual issue that would be decided later on? No, I look at appellant's own argument in the transgenomic case, and I look at the court's opinion there, and the court's opinion in other cases where free cash flow is not only not the most important input, but it is rejected as a basis for a Section 14a claim, and we cite case after case in which courts rejected claims. In fact, this court in Beck decided to affirm a grant of a motion to dismiss where the plaintiffs in that case argued that cash flow information should have been disclosed, and Beck found there was an absence of materiality in that allegation thereon. But there is not for want of cases that have considered the significance of cash flow, and they've considered it and they've rejected it, especially against the backdrop of the kind of allegations that are made here and the total mix of information that Vectran had in his proxy statement. But the court, even though the district court didn't reach this second ground sports decision, there is perhaps another path that the court can decide in the first instance here, and that is appellants have failed to plausibly contend that the alleged omissions at issue in this case rendered any statement in the proxy false or misleading. That is to say that even if the court, for whatever reason, finds that unlevered free cash flow information or business segment information is material, it could still find that the appellants did not show that the information was necessary in order to make the statements in the proxy not false or misleading. Omissions have no significance under Section 14A except to the extent that they render an affirmative statement misleading. This is a pleading requirement under both Rule 14A9 and PSLRA. Failure to plead what statement was rendered false was part of the reason that the district court in Beck dismissed plaintiffs' claim that the company's financial forecasts, including cash flows, should have been disclosed. Now we list our cases dismissing complaints on this basis on pages 44 to 46 of our brief, and then of course we sent a 28J letter on the Times v. Pesco case in the Fifth Circuit last month. Here, plaintiffs contend that the financial advisor used an unreasonable discount rate. They seem to be backing off of that here in argument, but that therefore the DCF analysis was misleading. But that's not an error in the proxy. That's simply a claim that the financial advisor's range of discount rates was too high. Now the proxy provides the rates used and the shareholders can judge whether the discount rate was appropriate, just as appellants seem to have done here. Appellants don't get to call the disclosures a half-truth, only to upend the fair summary standards of the financial advisor's work. This is exactly the kind of second-guessing... Excuse me, counsel. If I recall correctly, Mr. Keech's affidavit says in a number of places that these proxies are, quote, misleadingly incomplete. I wonder if you might address those allegations. Sure. Thank you, Your Honor. First, the reply brief seems to concede that the report is mere evidence and should not be considered for purposes of this analysis. I didn't read it that way, and we've said time and time again that in responding to a motion to give a preview of its evidence, we've said plaintiffs can elaborate on their pleadings in oral arguments, in briefs, can submit affidavits. They risk turning it into a summary judgment motion, but that didn't happen here. So I don't think you can ignore the Keech affidavit. Sure. And I suppose that other courts have noted that a paid-for expert cannot really move the needle on issues of materiality, including with respect to Mr. Keech's opinion. We have cases on pages 23 and 24 of our brief. But even if the court were to credit the opinion, it doesn't really offer an opinion on materiality. It doesn't apply the TSC standard to the projections, and it actually does not credit the view other than to raise issues about the analytical framework. And appellants don't plausibly plead what the cash flow information, either directly or through their experts, would have been. There is no half-truth here because the summary is incomplete, and Mr. Keech is welcome to his opinion, but that doesn't move the needle in a manner that renders part of the proxy false. And opinions, including Trahan, have come to the conclusion that you can quibble or take issue with the financial advisor's analysis, but that doesn't make a Section 14a claim, either. The other claim that plaintiffs make is that the omission of unlevered cash flow projections meant that the summary was incomplete. But, of course, if omitting information from a summary axiomatically rendered the summary incomplete, then every omission would be grounds for a Section 14a claim, and we've compiled cases rejecting this claim on pages 44 and 45 of our brief. But maybe going back to your question, Judge Hamilton, the other aspect that's really important is that even if appellants, even if Mr. Keech had alleged a false or misleading statement, it would fall within the safe harbor of the PSLRA. And here we know that the statutory language applies to all forward-looking statements, including financial projections. The safe harbor is used at the pleading stage all the time, and we collect cases on pages 47 and footnote 13 of our brief. No court has ever limited the safe harbor in the way that appellants contend it ought to be limited. Projections looking 10 years into the future are classic forward-looking statements, and the notion that sanctioning a projection converts it into a statement of present belief, which appellants argued in their reply, proves too much and has been rejected by the courts. Announcing that there are times when the safe harbor should not apply, but in this instance, both the summary of projections looking 10 years into the future and the financial advisor's analysis of those projections looking into future valuation is the very most pedestrian application of the safe harbor. So with that safe harbor, coupled with what we believe to be a failure of the pleadings, the appellants cannot possibly plead that any statement in the proxy is rendered false or misleading, and therefore the omission, no matter whether material or not, fails to raise a claim under section 14a. I ask you just a more general policy question here, Mr. David. Both sides in this case are denying that there are per se rules being applied here, and seem to suggest that courts ought to stay away from them. The cynic in me suggests that's a rule of full employment for securities lawyers in these transactions, whereas more specific regulations on disclosure from the SEC might actually provide greater certainty in the ability of issuers and the authors of proxy statements to be confident that they're within bounds. What do you think? Your Honor, here I would say that there is—the Business Roundtable routinely writes about TSC and materiality standards and always says we're happy where it is because if you put more language, you'll either overcorrect or you'll undercorrect, because you will never be able to get your arms around the entire universe of potential disclosures. So this is the best that you will get. And they balk when the SEC—SEC routinely adds new rules of late mandating disclosure of various items, and they bristle because the negative pregnant of addition suggests some sort of subtraction and threatens the avalanche of irrelevant information that the Supreme Court warned about in TSC. I would just use my remaining time to simply say that the district court correctly held that appellants failed to plausibly allege reported omissions causing economic harm. I would just note that this is particularly true where Vectrin ran a four-month-long competitive auction process, and there were also 10 other reasons that the board recommended the merger. And therefore, as the court in Trahan said, absent an allegation of a definitive, immediately available alternative, this is no more than a speculative possibility. Thank you. Thank you, Your Honor. Thank you, Mr. Davis. Mr. Monteverdi. Yeah, thank you. Really what boils down to is let's use the correct standard of materiality on a motion to dismiss, which is whether the information is immaterial as a matter of law, not whether it's material as a matter of law. And that's what we're fighting here. And frankly, cash flows, we put forth sufficient evidence why it's material here. And an example, we talked about transgenomic, which is my firm's case. It's not that we said net income matters there and not cash flows. What happened in that case, net income was hidden in the sense that they were suggesting it was higher than it really was because they combined it between the buyer and the seller. We got discovery. We were able to identify a misleading statement. And we got discovery, frankly, because we were pursuing a cash flow disclosure, which they ended up making prior to the transaction closing to avoid an injunction hearing. So put that aside, projections matter. And we have sufficient information. And paragraph 76, to Judge Santeef's point from earlier on damages, specifically states our concern is, look, you didn't tell them what the cash flows are. And Beck, which is a case from this court, makes it clear you're sending the wrong inference on value. We have sufficient facts to show that the value was undermined and by the omission of the disclosure because of a manipulation on the analysis. We're not challenging the analysis. We're saying by not giving the most important metric, cash flows, you deprive shareholders of being able to really view the value of the company. And it's a fair summary. Everyone seems to agree we got to give a fair summary. And I agree with Judge Hamilton. Maybe a specific rule from the SEC might help, but we don't have it today. And what I have are some cases that support our position. I understand defendants may have some cases that go against us, but at a motion to dismiss, it has to go to the plaintiff, not the defendant. And plausibility is not the same standard as likelihood for trial or for summary judgment. And we're playing this game of mixing standards. Let me ask this court, which I know the court knows, but I just want to say this was a motion to dismiss, supported by an affidavit from a financial expert, supported by a specific facts in the complaint, a 42-page complaint. This was not a quick answer to speak. And the attack that my firm files cases of this nature, yeah, that's all I do. And I worked a lot of money for shareholders. Last year, my firm recovered common funds in six cases, six merger cases, and were regularly listed as a top firm under ISS. This is what we do. And I think we know here there was a problem with the price. And the process that they ran is irrelevant. They didn't disclose the cash flows. They had it. They closed it. They chose not to. And now they must face the consequences. I would ask the court reverse dismissal, and we'll be allowed to take cover in this case. Thank you. All right. Thank you, Mr. Monteverdi. Our thanks to both counsel.